1

2

3

4

5

6

7

8 **UNITED STATES DISTRICT COURT**

9 **CENTRAL DISTRICT OF CALIFORNIA — WESTERN DIVISION**

10

11 CYNTHIA J. BOX,                         Case No. EDCV 06-648-JWJ

12                     Plaintiff,          ORDER REMANDING ACTION
                                           FOR FURTHER PROCEEDINGS
13          vs.

14 MICHAEL J. ASTRUE,[1]
   Commissioner of the Social
15 Security Administration,

16                     Defendant.

17 ─────────────────────────────

18

19          Plaintiff seeks review of the decision of defendant Commissioner of the

20 Social Security Administration, denying plaintiff's application for

21 Supplemental Security Income under Title XVI of the Social Security Act.  As

22 discussed below, this Court vacates the decision of the Administrative Law

23 Judge and remands this action to the Commissioner for further proceedings.

24 ///

25 ///

26 ─────────────────────────────

27      [1]  Michael J. Astrue became the Commissioner of Social Security on February 12,
   2007.  Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J.
28 Astrue should be substituted in place of Commissioner Jo Anne B. Barnhart as defendant
   in this action. No further action need be taken to continue this suit by reason of the
   last sentence of 42 U.S.C. § 405(g).

## I.  SUMMARY OF DISTRICT COURT PROCEEDINGS

On June 29, 2006, plaintiff Cynthia J. Box filed a "Complaint" to review the decision of the Commissioner of Social Security (hereinafter "Complaint"). On July 27, 2006, the parties consented, pursuant to 28 U.S.C. § 636(c), to proceed before United States Magistrate Judge Jeffrey W. Johnson, and to have the Magistrate Judge conduct any and all further proceedings in the instant action and order the entry of final judgement.  On November 8, 2006, defendant filed an "Answer to Complaint," along with a copy of the Certified Administrative Record (hereinafter "CAR") of the administrative proceedings in this matter.  On March 20, 2007, the parties filed a Joint Stipulation addressing their respective claims.

This matter is now deemed under submission and ready for decision.

## II.  FACTUAL BACKGROUND

### A.     Summary of Administrative Proceedings

On February 7, 2000, plaintiff protectively filed an application for Supplemental Security Income Benefits.  (CAR 72-75.)  On May 17, 2000, it was determined that plaintiff was disabled as of February 1, 2000 due to her mental impairments.  (CAR 30.)  Subsequently, a continuing disability review was initiated to determine whether plaintiff was still entitled to benefits:  it was determined initially and on reconsideration that plaintiff's disability had ceased as of October 1, 2004.[2]  (31-36, 44-55.)   On March 23, 2005, plaintiff filed a request for hearing before an Administrative Law Judge.  (CAR 58.)   On June 14, 2005, Administrative Law Judge F. Keith Varni (hereinafter "ALJ") conducted a hearing; plaintiff appeared without counsel and waived her right to

---

[2] Plaintiff was informed that her last payment would be for the period through December 31, 2004.  (CAR 32, 34.)

1   representation.  (CAR 359-89.)   Plaintiff testified at the June 14, 2005 hearing
2   on her own behalf.  (CAR 361-75.)   Plaintiff's representative payee and a
3   vocational expert also testified at the hearing.  (CAR 375-86.)   On November
4   28, 2005, the ALJ issued an opinion denying benefits.  (CAR 10-27.)   Plaintiff
5   requested review of the ALJ's decision on January 17, 2006; the Appeals
6   Council denied review on May 6, 2006, thus making the decision of the ALJ
7   the final decision of the Commissioner in that matter. (CAR 4-7.)  See 20
8   C.F.R. § 404.900(a)(5).

9   **B.    Relevant Facts Regarding Plaintiff's Personal History, Medical**
10        **Condition and Treatment**

11        Born June 18, 1960, plaintiff was forty-four years old at the time of her
12  June 14, 2005 hearing.  (CAR 73, 363.)  Plaintiff graduated from high school
13  and attended two years of college.  (CAR 102, 363.)  Plaintiff has no past
14  relevant work experience.  (CAR 96-97.)  On May 17, 2000, the Social
15  Security Administration found that plaintiff was disabled as of February 1,
16  2000 due to a schizophrenic, paranoid or other psychotic disorder.  (CAR 30.)
17  Subsequently, a continuing disability review found that plaintiff's disability
18  had ceased as of October 1, 2004, and plaintiff was advised that her last
19  payment would be for the period ending December 31, 2004.  (CAR 31-36, 44-
20  55.)

21        On April 4, 2000, plaintiff underwent a psychiatric evaluation with
22  Andrew J. Rooks, M.D.  (CAR 255-61.)  Plaintiff's behavior was cooperative
23  and she was reasonably friendly.  (CAR 258.)  Dr. Rooks reported that
24  plaintiff's thought processes flowed adequately well and were coherent, but
25  noted that her thought content was marked by severe delusions, ideas of
26  reference and a preoccupation with her delusional beliefs.  (CAR 258.)
27  Dr. Rooks found that plaintiff did not appear to be hallucinating in the office,
28  but plaintiff admitted to having hallucinations.  (CAR 258.)  Plaintiff's anxious

affect was appropriate for her thought content.  (CAR 258.)   Plaintiff was

oriented times three, but her concentration was impaired.  (CAR 258.)

Dr. Rooks noted that although plaintiff attended college, she appeared to be

functioning at a rather low IQ level:  she could not spell the word "world"

backwards; she could not spell "earth" or "bird" or "please" or "question"

correctly forward; she could not recall the name of the current president; and

she could not state how an orange might be similar to a banana. (CAR 258-59.)

Plaintiff reported that she contacts Jesus by watching TV and "waiting for him

to talk to me." (CAR 259.)  Dr. Rooks diagnosed plaintiff with the following:

schizoaffective disorder or schizophrenia; prior heroin addict and

polysubstance abuser; antisocial personality traits, limited to prostituting and

substance using; hepatitis B and hepatitis C, by history; old abscess scars from

prior injections; and psychotic thought processes that cause plaintiff anxiety.

(CAR 260.)  Plaintiff's global assessment of functioning was rated at 30-35.

(CAR 260.)

        Dr. Rooks determined that plaintiff was not able to maintain social

functioning and had severe impairment in concentration.  (CAR 260.)  He

found that her persistence and pace were only good in pursuing psychotic

delusions and that she had not been able to work due to her psychotic thought

processes.  (CAR 260.)  Dr. Rooks opined that plaintiff was able to understand,

carry out and remember simple instructions, but was too preoccupied to

perform detailed and complex tasks significantly.  (CAR 261.)  He also found

that she was not able to maintain regular attendance or perform work activities

on a consistent basis due to her psychosis.  (CAR 261.) Dr. Rooks determined

that plaintiff would not be able to complete a normal work day or work week

consistently, without interruption from psychotic thought processes.  (CAR

261.)  Dr. Rooks further noted that plaintiff's delusions and hallucinations

were her main limitations in her work adaptability, though her academic skills

1    were also exceedingly poor.  (CAR 261.)

2         On May 16, 2000, Edward O'Malley, M.D. completed a psychiatric

3    review technique form regarding plaintiff.  (CAR 264-72.)  Dr. O'Malley

4    concluded that plaintiff suffered from psychotic and personality disorders that

5    met Listing 12.03A, B2, 3.  (CAR 264, 266, 269.)  The doctor determined that

6    plaintiff had moderate limitations in activities of daily living, marked

7    limitations in maintaining social functioning, frequent difficulties maintaining

8    concentration, persistence or pace, and that she had one or two episodes of

9    deterioration or decompensation in work or work-like settings.[3]   (CAR 271.)

10        Plaintiff was treated by Dr. Pourteymour between October 22, 2002 and

11   February 17, 2005.  (CAR 333-58.)  On October 22, 2002, it was noted that

12   plaintiff's last seizure was 5 months earlier when she went without medication.

13   (CAR 350.)  Dr. Pourteymour's assessment included seizure disorder, asthma,

14   tobacco abuse and hepatitis C.  (CAR 350.)   Plaintiff was seen by

15   Dr. Pourteymour for an asthma assessment on November 6, 2002.  (CAR 349.)

16   The record reflects that plaintiff was taking Albuterol.  (CAR 349.)   Plaintiff

17   was diagnosed with COPD, seizure disorder and tobacco abuse.  (CAR 349.)

18   Plaintiff continued to be diagnosed with COPD, hepatitis C, tobacco abuse and

19   seizure disorder by Dr. Pourteymour.  (CAR 333-45.)  Plaintiff was also

20   diagnosed with bipolar disorder.  (CAR 334-38, 340.)

21        On September 8, 2004, Diane Rose, M.D. completed a physical residual

22   functional capacity assessment of plaintiff. (CAR 275-82.)  Dr. Rose

23   determined that plaintiff could lift and/or carry 20 pounds occasionally and 10

24   pounds frequently, stand and/or walk for about 6 hours in an 8-hour workday,

25   sit for about 6 hours in an 8-hour workday, and that she had an unlimited

26

27        [3] The Court notes that these records are before the relevant time period, which is
28   October 1, 2004.

1    ability to push and/or pull.  (CAR 276.)  Dr. Swan opined that plaintiff could
2    occasionally climb, balance, stoop, kneel, crouch and crawl.  (CAR 277.)
3    Dr. Rose concluded that plaintiff had no manipulative, visual or
4    communicative limitations, and that she should avoid concentrated exposure to
5    fumes, odors, dusts, gases and poor ventilation, and hazards, such as machinery
6    and heights.  (CAR 278-79.)

7        On December 9, 2004, plaintiff underwent a complete psychiatric
8    evaluation with Linda M. Smith, M.D.  (CAR 289-98.)  Plaintiff's chief
9    complaint was "listening to what my voices say instead of ignoring it." (CAR
10   289.)  Dr. Smith reported that as the interview continued, "it bec[ame] more
11   and more obvious that she's really not psychotic at all."  (CAR 290.)  Dr.
12   Smith noted that there was no mention at all of any of the prominent religious
13   delusions and religious preoccupations that plaintiff portrayed in April 2000.
14   (CAR 290.)

15       Dr. Smith described plaintiff as superficially cooperative, and noted that
16   she was able to volunteer information spontaneously.  (CAR 294.)  Plaintiff
17   displayed no psychomotor agitation or retardation.  (CAR 294.)  Dr. Smith
18   reported substantial evidence of exaggeration and manipulation throughout the
19   interview, and noted that plaintiff did not appear to be genuine and truthful.
20   (CAR 294.)   Dr. Smith found no evidence at all of any of plaintiff's
21   "psychotic" claims, and noted that plaintiff became very goal oriented and
22   focused on evading questions towards the end of the interview.  (CAR 294.)

23       Plaintiff was relevant and non-delusional.  (CAR 294.)  Dr. Smith
24   reported no bizarre or psychotic thought content and no current suicidal or
25   homicidal ideation.  (CAR 294.)  Plaintiff reported having auditory, visual and
26   tactile hallucinations, but Dr. Smith noted that this was not credible since
27   plaintiff did not appear to be responding to internal stimuli during the
28   interview.  (CAR 294.)

1       Plaintiff reported a depressed mood, but Dr. Smith noted that her affect

2   on an objective basis appeared to be full and animated.  (CAR 295.)  Plaintiff's

3   speech had normal rate and tone; it was not pressured.  (CAR 295.)

4   Dr. Smith noted that plaintiff's mental status exam cannot be considered

5   reliable because plaintiff was not credible and gave poor effort throughout.

6   (CAR 295.)  Plaintiff was alert and oriented in all spheres and appeared to have

7   at least average intelligence.  (CAR 295.)  Plaintiff's insight and judgment

8   regarding her current situation appeared to be intact.  (CAR 296.)   Dr. Smith

9   diagnosed plaintiff with polysubstance abuse and antisocial personality traits

10  and rated her current global assessment of functioning at 85.  (CAR 296.)

11      Dr. Smith noted that when plaintiff was confronted, she became totally

12  "clear" psychiatrically, very evasive and worked very hard to maneuver and

13  sidestep questions which directly contradicted any claim of being psychotic.

14  (CAR 297.)  Dr. Smith found no evidence at all of any of the religious

15  preoccupation that plaintiff claimed she had experienced the last time she was

16  examined.  (CAR 297.)  Dr. Smith noted that she doubted whether plaintiff

17  ever had schizophrenia, and that the entire interview appeared to have been

18  staged.  (CAR 297.)

19      Dr. Smith determined that plaintiff has no impairment in her ability to

20  understand, remember or complete simple or complex commands, no

21  impairment in her ability to interact appropriately with supervisors, co-workers

22  or the public, no impairment in her ability to comply with job rules such as

23  safety and attendance, and no impairment in her ability to respond to change

24  in the normal workplace setting or to maintain persistence and pace in a

25  normal workplace setting. (CAR 297-98.)

26      On December 14, 2004, Tariq Jamil, M.D. conducted a complete

27  internal medicine evaluation of plaintiff.  (CAR 299-03.)  Plaintiff's chief

28  complaints included history of grand mal and petit mal seizures, chronic low

back pain and swollen feet.  (CAR 299.)  Plaintiff was alert and oriented times three and in no acute distress.  (CAR 301.)   Plaintiff's range of motion in her neck was within normal limits.  (CAR 301.)   Examination of her back revealed mild tenderness to palpation in the paraspinal areas (right and left), and range of motion in the back was within normal limits.  (CAR 302.)   Plaintiff's motor strength was 5/5 in all extremities, her sensation was intact to light touch with pinprick, vibration and position, and her gait was within normal limits.  (CAR 302-03.)  Dr. Jamil's impressions included the following:  chronic low back pain most likely secondary to muscle strain – no motor or sensory deficits; history of grand mal and petit mal seizures, which are not well controlled; foot and lower leg pain – rule out osteoarthritis; hepatitis C; and history of depression.  (CAR 303.)

Dr. Jamil opined that plaintiff can lift and carry 100 pounds occasionally and 50 pounds frequently, can stand and walk for 6 hours in an 8 hour day and can sit for 6 hours in an 8 hour day.  (CAR 303.) Dr. Jamil determined, however, that in view of plaintiff's grand mal seizures, she should avoid working at heights and operating machinery.  (CAR 303.)

Plaintiff also underwent a Visual Acuity Test based on the Snellen Chart on December 14, 2004. (CAR 304.)  Plaintiff's vision was 20/40 in the right eye and 20/50 in the left eye.  (CAR 304.)  It was noted that plaintiff can visually move about the office without any help.  (CAR 304.)

On December 22, 2004, a state agency psychiatrist completed a psychiatric review technique form regarding plaintiff.  (CAR 307-20.)  The medical consultant found that plaintiff suffers from a psychotic disorder by history, which the consultant considered a non-severe impairment.  (CAR 307, 309.)  The psychiatrist determined that plaintiff had no limitations in activities of daily living, maintaining social functioning and maintaining concentration, persistence or pace.  (CAR 317.)

1    On December 28, 2004, David A. Haaland, M.D. completed a physical

2    residual functional capacity assessment of plaintiff. (CAR 324-31.)

3    Dr. Haaland concluded that plaintiff had no exertional, postural, manipulative,

4    visual or communicative limitations, and that she should avoid hazards, such as

5    machinery and unprotected heights. (CAR 325-28.)

6    **C.    Testimony Before the Administrative Law Judge**

7        1.    Plaintiff's Testimony

8    Plaintiff appeared at the June 14, 2005 ALJ hearing and testified on her

9    own behalf.[4] (CAR 361-75.) Plaintiff testified that she completed high school

10   and has some education beyond high school. (CAR 363.) Plaintiff stated that

11   she has not worked since she was a teenager, and that she has been getting

12   social security income since 2000. (CAR 363-64.)

13   Plaintiff testified that she has been diagnosed with schizophrenia, and

14   stated that she does not like to go out very often or to be around people. (CAR

15   364.) Plaintiff indicated that she has never been hospitalized for her mental or

16   emotional problems and that she receives treatment from a therapist, and

17   noted that she sees a doctor every two weeks who prescribes medication. (CAR

18   364-65.) Plaintiff testified that she takes Geodon, Clonazepam and Lexapro.

19   (CAR 366-67.)

20   Plaintiff further testified that she suffers from seizures and back pain:

21   plaintiff indicated that she has had seizures for about eight or nine years.

22   (CAR 368.) Plaintiff explained that she loses consciousness during her

23   seizures, and estimated that she has seizures twice a month. (CAR 368-69.)

24   Plaintiff noted that she recently went to the emergency room for seizures.

25   (CAR 368-69.) Plaintiff also stated that she has scoliosis, which causes her

26

27        [4] The ALJ advised plaintiff that she had the right to be represented in the
proceedings by either an attorney or someone else who was qualified. (CAR 361.)

28   Plaintiff indicated that she intended to represent herself in the proceedings. (CAR 361.)

1  back pain.  (CAR 370.)   Plaintiff testified that she takes medication for the
2  pain, but reported that she has never had any other treatment for her back.

3    Plaintiff reported that she does not presently have a driver's license and
4  that she is currently living in a mobile home with her payee representative.
5  (CAR 371-72.)   Plaintiff testified that she generally plays computer games and
6  watches television during the day.  (CAR 372-73.)  Plaintiff also stated that she
7  does some cooking and housekeeping.  (CAR 373.)  Plaintiff noted that she is
8  widowed and that she has two children ages 22 and 24; her oldest son also lives
9  with her in the mobile home.  (CAR 374.)  Plaintiff testified that she does not
10  believe that her health has changed since she was granted benefits in 2000.
11  (CAR 375.)

12    2. Ruben Gonzalez's Testimony

13    Plaintiff's payee representative Ruben Gonzalez also testified at the
14  hearing.  (CAR 375-82.)   Mr. Gonzalez testified that he has known plaintiff
15  "on and off" for 14 years, but that he has been renting a room to her for 8
16  years.  (CAR 376.)  Mr. Gonzalez explained that when he first met plaintiff she
17  used to wear make-up and go out with girlfriends, but noted that she is now
18  reclusive, her work habits have deteriorated, and she has to be encouraged to
19  attend to personal hygiene.  (CAR 377.)

20    Mr. Gonzalez testified that the prior week, plaintiff had a seizure and
21  that he had to take her to the emergency room.  (CAR 379.)  Mr. Gonzalez
22  noted that when plaintiff has a seizure, she does not remember where she is or
23  what she is doing.  (CAR 379.)  Mr. Gonzalez testified that plaintiff generally
24  takes her seizure medication, but that she ran out of her medication (because
25  she spilled water on some tablets which dissolved), and could not refill her
26  prescription until a certain time had expired.  (CAR 379-80.)  Mr. Gonzalez
27  estimated that plaintiff had her seizure after approximately four or five days of
28  not taking her medication.  (CAR 382.)

3.    <u>Vocational Expert's Testimony</u>

Vocational expert Sandra Fioretti (hereinafter "VE") also testified at the hearing.  (CAR 383-86.)  The ALJ presented the VE with a hypothetical individual of plaintiff's age, education and vocational background, who can lift 100 pounds occasionally and 50 pounds frequently, stand and walk for six hours in an eight-hour workday, sit for six hours in an eight-hour workday, and who should observe the usual seizure precautions of not working at heights or around dangerous unguarded moving machinery or in similar hazardous environments.  (CAR 383-84.)  The VE testified that such an individual could perform an unlimited range of heavy work.  (CAR 384.)

The ALJ then presented the VE with a second hypothetical individual with the following residual functional capacity:  able to lift 20 pounds occasionally and 10 pounds frequently; able to sit, stand and walk up to six hours each in a normal eight-hour workday; should avoid any repetitive bending or stooping because of her back complaints; and having the same seizure precautions as in the first hypothetical (no working at heights or around dangerous unguarded moving machinery or in similar hazardous environments).  (CAR 384.)  The ALJ further instructed the VE that this hypothetical individual should be limited to work which is routine and repetitive, entry level, minimally stressful, and which requires no contact with the general public and only a superficial degree of interpersonal contact with coworkers and supervisors.  (CAR 384.)  The VE testified that such an individual could perform a limited range of light work.  (CAR 384.)

The ALJ then asked the VE whether such an individual, given the seizure precautions, the avoidance of repetitive bending and stooping and the mental limitations, could perform any kind of entry level unskilled work.  (CAR 382.)  The VE testified that such an individual could perform the following work:  bench assembler (light, unskilled), of which there are 3,000 positions regionally

1   and 25, 000 positions nationally; inspector and hand packager (light,

2   unskilled), of which there are 1,000 positions regionally and 19,000 positions

3   nationally; and cleaner in housekeeping (light, unskilled), of which there are

4   6,000 positions regionally and 100,000 positions nationally.  (CAR 385.)   The

5   VE explained that such jobs could be learned through demonstration or verbal

6   instruction within a 30-day period.  (CAR 385.)

7        Finally, the ALJ inquired whether a person who could not leave their

8   dwelling could perform the jobs the VE had discussed.  (CAR 385.)   The VE

9   stated that such a person could not perform those jobs.  (CAR 385.)

10  **D.    The ALJ's Decision**

11       On November 28, 2005, the ALJ issued a decision denying plaintiff's

12  application for benefits.  (CAR 10-27.)  The ALJ reported that plaintiff had

13  been found to be disabled within the meaning of the Social Security Act

14  beginning February 1, 2000: the impairments present at that time were

15  schizophrenia, a personality disorder, a seizure disorder and a history of

16  hepatitis C.  (CAR 26.)  However, the ALJ determined that based on the

17  medical evidence, there has been improvement in the plaintiff's medical

18  impairments since May 2000 which are related to the plaintiff's ability to

19  work.  (CAR 26.)

20       The ALJ found that based on the medical evidence, plaintiff currently

21  has medically determinable impairments consisting of a seizure disorder,

22  scoliosis of the lumbosacral spine, a history of hepatitis C, a history of chronic

23  obstructive pulmonary disease, polysubstance abuse in questionable remission,

24  antisocial personality traits and a psychotic disorder by history.  (CAR 26.)

25  However, the ALJ concluded that plaintiff does not currently have an

26  impairment or combination of impairments which meets or  medically equals

27  the severity of any impairment listed in Appendix 1, Subpart P, 20 CFR Part

28  404.  (CAR 26.)   The ALJ also found that plaintiff's allegations regarding her

1    limitations since at least October 1, 2004 are not totally credible.  (CAR 26.)

2         The ALJ determined that plaintiff has the residual functional capacity to

3    perform work at the light level of exertion with some non-exertional

4    limitations.  (CAR 26.)  Specifically, the ALJ found that plaintiff has the

5    following residual functional capacity:  able to lift 20 pounds occasionally and

6    10 pounds frequently; able to stand and walk up to 6 hours each in the normal

7    8 hour workday; should avoid any repetitive bending or stopping and should

8    not work at heights, around dangerous unguarded moving machinery or in

9    similar hazardous environments; limited to work that is routine and repetitive,

10   entry level and minimally stressful; and cannot work with the general public

11   and can have only a superficial degree of interpersonal contact with coworkers

12   and supervisors.  (CAR 26-27.)

13        The ALJ found that plaintiff has no past relevant work. (CAR 27.)   The

14   ALJ also found that plaintiff was a "younger individual" and has more than a

15   high school education.  (CAR 27.)  The ALJ determined that although

16   plaintiff's exertional limitations do not allow her to perform the full range of

17   light work as of October 1, 2004, using Medical-Vocational Guidelines rule

18   202.20 as a framework for decision-making, there are a significant number of

19   jobs in the national economy that plaintiff could perform, including work as a

20   bench assembler, inspector/hand packager and cleaner/housekeeper.  (CAR 27.)

21   Accordingly, the ALJ concluded that plaintiff was no longer under a

22   "disability," as defined by the Social Security Act, as of October 1, 2004, and

23   thus, plaintiff's eligibility for Supplemental Security Income payments ended

24   effective December 31, 2004 (the end of the second calendar month after the

25   month in which the disability ceased).  (CAR 27.)

26

27                      **III.  STANDARD OF REVIEW**

28        The Court, pursuant to 42 U.S.C. § 405 (g), has the authority to review

1   the Commissioner's decision terminating plaintiff's disability benefits to

2   determine if his findings are supported by substantial evidence and whether the

3   Commissioner used the proper legal standards in reaching his decision.  <u>Meanel</u>

4   <u>v. Apfel</u>, 172 F.3d 1111, 1113 (9th Cir. 1999); <u>Reddick v. Chater</u>, 157 F.3d

5   715, 720 (9th Cir. 1998).  "Substantial evidence is more than a scintilla, but

6   less than a preponderance."  <u>Reddick v. Chater</u>, 157 F.3d 715, 720 (9th Cir.

7   1998).  It is "relevant evidence which a reasonable person might accept as

8   adequate to support a conclusion."  (<u>Id.</u>)  To determine whether substantial

9   evidence supports a Commissioner's findings, the reviewing court "must review

10   the administrative record as a whole, weighing both the evidence that supports

11   and the evidence that detracts from the Commissioner's conclusion."  (<u>Id.</u>)  "If

12   the evidence can reasonably support either affirming or reversing," the

13   reviewing court "may not substitute its judgment" for that of the

14   Commissioner.  <u>Reddick</u>, 157 F.3d at 720-721; <u>see also</u> <u>Osenbrock</u>, 240 F.3d

15   at 1162.

16         An individual is "disabled" for the purpose of receiving benefits under

17   the Act if she is unable to engage in any substantial gainful activity due to an

18   impairment which has lasted, or is expected to last, for a continuous period of

19   at least twelve months.  42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. § 416.905(a).

20   "Once a claimant has been found to be disabled, . . . a presumption of

21   continuing disability arises in her favor[, and the Commissioner] bears the

22   burden of producing evidence sufficient to rebut this presumption of

23   continuing disability."  <u>Bellamy v. Sec'y of Health & Human Serv.</u>, 755 F.2d

24   1380, 1381 (9th Cir. 1985); <u>Murray v. Heckler</u>, 722 F.2d 499, 500 (9th Cir.

25   1983).

26         A recipient whose condition has improved medically so she is able to

27   engage in substantial gainful activity is no longer disabled.  42 U.S.C. §

28   1382c(a)(4); 20 C.F.R. § 416.994; <u>Flaten v. Sec'y of Health & Human Servs.</u>,

1   44 F.3d 1453, 1459-60 (9th Cir. 1995).  A medical improvement is:

2   [A]ny decrease in the medical severity of [a recipient's] impairment(s)

3   which was present at the time of the most recent favorable medical

4   decision that [the recipient was] disabled or continued to be disabled.  A

5   determination that there has been a decrease in medical severity must be

6   based on changes (improvement) in the symptoms, signs and/or

7   laboratory findings associated with [the recipient's] impairment(s) . . . .

8   20 C.F.R. § 416.994(b)(1)(i), (2)(I).

9

10   ## IV.  THE FIVE-STEP ANALYSIS

11       In assessing whether there is a medical improvement, the ALJ must first

12   compare the severity of the recipient's current impairments to the severity of

13   the impairments when the recipient most recently was found to be disabled.

14   20 C.F.R. § 416.994(b)(1)(vii).  If the recipient's current impairments meet or

15   equal the severity of an impairment listed in the Listing of Impairments, 20

16   C.F.R. § 404, Subpart P, App. 1, the recipient's disability continues.  20 C.F.R.

17   § 416.994(b)(5)(i).  Similarly, if there has been no decrease in medical severity,

18   there has been no medical improvement.  20 C.F.R. § 416.994(b)(5)(ii).

19       Second, if medical improvement is shown through objective medical

20   evidence, the ALJ must compare the recipient's current residual functional

21   capacity ("RFC") to her RFC at the time she most recently was found to be

22   disabled to determine whether the medical improvement is related to the

23   recipient's ability to do work.[5]  20 C.F.R. § 416.994(b)(2)(ii-iii), (b)(5)(iii).  If

24

25       [5]   In situations, such as here, where the recipient's impairment was found to have
26   met or equaled a Listing, no prior RFC assessment would have been performed; however,
    "[i]f there has been medical improvement to the degree that the requirement of the
27   listing section is no longer met or equaled, then the medical improvement is related to
    [the recipient's] ability to work."  20 C.F.R. § 416.994(b)(2)(iv)(A).
28

- 15 -

the medical improvement is unrelated to the recipient's ability to do work, the ALJ must consider whether certain enumerated exceptions apply.  20 C.F.R. § 416.994 (b)(3-4), (b)(5)(iv).  If no exception applies, the recipient's disability continues.  20 C.F.R. § 416.994(b)(iv).

Third, if the medical improvement is related to the recipient's ability to do work, the ALJ must determine whether the recipient's current impairments are severe; if not, the recipient is no longer disabled.  20 C.F.R. § 416.994 (b)(5)(v).

Fourth, if the recipient's current impairments are severe, the ALJ must determine whether the recipient, based on her current RFC, can perform her past relevant work; if so, the recipient is no longer disabled.  20 C.F.R. § 416.994(b)(5)(vi).

Fifth, if the recipient, based on her current RFC cannot perform her past relevant work, then the ALJ must determine whether the recipient, based on her age, education, work experience and current RFC, is capable of performing other work; if so, the recipient is no longer disabled.  20 C.F.R. § 416.994(b)(5)(vii).

## V.   DISCUSSION

**A.    The ALJ's Evaluation**

The ALJ found that plaintiff was disabled within the meaning of the Social Security Act beginning February 1, 2000, at which time plaintiff suffered from the following impairments: schizophrenia, a personality disorder, a seizure disorder and a history of hepatitis C.  (CAR 26.)  The ALJ next determined that plaintiff currently suffers from an impairment or a combination of impairments considered "severe" under the regulations.  (CAR 26.)  However, the ALJ concluded that plaintiff does not currently have an impairment that meets or medically equals one of the listed impairments in Appendix 1,

1   Subpart P, Regulation No. 4.  (CAR 26.)  The ALJ determined that the medical

2   evidence establishes that there has been an improvement in plaintiff's medical

3   impairments since May 2000, and that the medical improvement is related to

4   the plaintiff's ability to work.  (CAR 26.)  The ALJ next found that plaintiff has

5   no past relevant work.  (CAR 27.)   Finally, the ALJ found that plaintiff has the

6   residual functional capacity to perform a significant range of light work.  (CAR

7   26-27.)  Accordingly, the ALJ concluded that plaintiff was no longer under a

8   "disability," as defined in the Social Security Act, as of October 1, 2004 and

9   thus, plaintiff's eligibility ended effective December 31, 2004.  (CAR 27.)

10          The parties have stipulated that the following two issues are in dispute,

11  to wit:

12          1.     Whether the ALJ properly developed the record; and

13          2.     Whether the ALJ properly considered the psychiatric consultative

14                 examiner's opinion of functional status.

15  (Joint Stipulation, p. 3.)

16  **B.     Development of the Record**

17          Plaintiff argues that the ALJ did not fully and fairly develop the record

18  because he failed to make a good faith effort to obtain records from Dr. Villar

19  which may contain significant medical data regarding the plaintiff's condition.

20  (Joint Stipulation, pp. 4-5.)  Defendant argues that substantial evidence, which

21  is neither vague nor ambiguous, supported the ALJ's decision.  (Id. at 7-8.)

22          The ALJ has an independent duty to fully develop the record.  42 U.S.C.

23  § 423(d)(5)(b); 20 C.F.R. § 404.1512(d)(e).  This duty persists even where the

24  claimant is represented by counsel and is more pronounced where the claimant

25  is represented by a lay person or may be mentally ill. Smolen v. Chater, 80

26  F.3d 1273, 1288 (9th Cir. 1996); Tonapetyan v. Halter, 242 F.3d 1144, 1150

27  (9th Cir. 2001).  However, this duty is only triggered when the record does not

28  present sufficient evidence to allow the ALJ to reach a decision.  Tonapetyan v.

1   Halter, 242 F.3d at 1150 (an ALJ has a duty to fully and fairly develop the

2   record if the evidence is ambiguous or the record is inadequate to allow for

3   proper evaluation of the evidence).

4        Here, the ALJ found that plaintiff experienced medical improvement in

5   the form of a decrease in the medical severity of her mental symptoms based

6   on the report from Dr. Smith and plaintiff's treatment history.  (CAR 19.)

7   However, the ALJ noted that the record is unclear as to how often plaintiff had

8   psychiatric treatment after she was awarded SSI disability payments.  (CAR

9   17.)  The ALJ explained that plaintiff's testimony at the hearing was vague

10  regarding her past mental health treatment history: plaintiff testified that she

11  had been seeing Dr. Villar "on and off" for a couple of years, stopped seeing

12  him for a while, and then started treatment with a new doctor.  (CAR 17, 365.)

13  The ALJ then noted that Dr. Villar failed to respond to requests for plaintiff's

14  records by the State Agency.  (CAR 17.)

15       Since plaintiff was not represented by counsel, the ALJ should have been

16  especially diligent.  Thompson v. Schweiker, 665 F.2d 936, 941 (9th Cir.

17  1982) (When a claimant is not represented by counsel, the ALJ has a duty to

18  scrupulously and conscientiously probe into, inquire of, and explore for all the

19  relevant facts). The duty is also important in cases of mental impairment

20  "because mentally ill persons may not be capable of protecting themselves from

21  possible loss of benefits by furnishing necessary evidence." Delorme v. Sullivan,

22  924 F.2d 841, 849 (9th Cir. 1991).  The ALJ relied on plaintiff's treatment

23  history as evidence in support of his finding that plaintiff experienced medical

24  improvement; however he explicitly stated that her treatment record was

25  unclear.  The ambiguity of the record in this case triggered the ALJ's

26  independent duty to develop the record.  Tonapetyan, 242 F.3d at 1150.

27  Thus, the ALJ should have more diligently pursued the records from plaintiff's

28  treating physicians: Dr. Villar, and the physician that treated plaintiff after

1   Dr. Villar's retirement.  (CAR 365.)

2   **C.     Remedy.**

3          The decision whether to remand for further proceedings or order an

4   immediate award of benefits is within the district court's discretion.  <u>Harman v.</u>

5   <u>Apfel</u>, 211 F.3d 1172, 1175-78 (9th Cir. 2000).  Where no useful purpose

6   would be served by further administrative proceedings, or where the record has

7   been fully developed, it is appropriate to exercise this discretion to direct an

8   immediate award of benefits.  <u>Id.</u> at 1179 ("the decision of whether to remand

9   for further proceedings turns upon the likely utility of such proceedings").

10  However, where there are outstanding issues that must be resolved before a

11  determination of disability can be made, and it is not clear from the record that

12  the ALJ would be required to find the claimant disabled if all the evidence were

13  properly evaluated, remand is appropriate.  <u>Id.</u>

14         Here, the Court has concluded that the ALJ failed to develop the record.

15  Accordingly, remand is necessary so that further administrative proceedings

16  may be conducted.   Specifically, on remand, the ALJ should make every

17  reasonable effort to obtain records from plaintiff's treating physicians,

18  including use of subpoenas or questionnaires, to adequately determine

19  plaintiff's treatment history.  The ALJ should then determine, in light of the

20  new evidence, whether plaintiff suffers from a disability as defined by the

21  Social Security Act.[6]

22  / / /

23  / / /

24  _____

25        [6] Since this Court has determined that remand is necessary to conduct further
    proceedings and reevaluate plaintiff's disability status in light thereof, the Court does not
26  address the other disputed issue presented by the parties: namely, whether the ALJ
    properly considered the consultative examiner's opinion of functional status. (Joint
27  Stipulation, p. 3.)  This issue should be addressed by the ALJ on remand, as necessary,
28  in light of the new evaluation.

1

## ORDER

2      Accordingly, **IT IS HEREBY ORDERED** that this action is remanded to

3  the Commissioner pursuant to section four of 42 U.S.C. § 405(g).

4      **IT IS FURTHER ORDERED** that the Clerk of the Court serve copies of

5  this order and the Judgment herein on all parties or their counsel.

6

7  DATED:  September 24, 2007

8

9                                              _____/s/_____

10                                             JEFFREY W. JOHNSON
                                               United States Magistrate Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28